UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **DOYAL WILEY JOHNSON** | **CIV. ACTION NO. 3:21-01128** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **KILOLO KIJAKAZI, ACTING COMMISSIONER, U.S. SOCIAL SECURITY ADMINISTRATION** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## REPORT AND RECOMMENDATION

Before the court is Plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice.

## Background & Procedural History

Doyal Johnson filed the instant applications for Title II disability insurance benefits and Title XVI supplemental security payments on May 8, 2019. (Tr. 15, 182-190). Johnson, who was 51 years old at the time of the administrative hearing, asserted a disability onset date of October 1, 2018, because of heart and back problems. (Tr. 33-34, 209-210). The state agency denied the claim initially on August 26, 2019, and upon reconsideration on December 12, 2019. (Tr. 47-98, 101-107, 109-116). Thereafter, Johnson requested and received a July 8, 2020 hearing before an Administrative Law Judge ("ALJ"). (Tr. 29-46). In an August 28, 2020 written decision, the ALJ determined that Johnson was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that he was able to make an adjustment to work that exists in significant numbers in the national economy. (Tr. 12-22).

Johnson appealed the adverse decision to the Appeals Council. On February 22, 2021, however, the Appeals Council denied Johnson's request for review; thus, the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3).

On April 27, 2021, Johnson filed the instant complaint for judicial review of the Commissioner's final decision. Following submission of the administrative transcript and supporting memoranda, the matter is now before the court.

## **Standard of Review**

This court's standard of review is (1) whether the final decision is supported by substantial evidence, and (2) whether the Commissioner applied the proper legal standards to evaluate the evidence. *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted). The Supreme Court has emphasized that

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, ___ U.S. ___, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

Upon finding substantial evidence, the court may only review whether the Commissioner has applied proper legal standards and conducted the proceedings consistently with the statute and regulations. *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983). In other words, where

the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed – *unless* the Commissioner applied an incorrect legal standard that materially influenced the decision. *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

## **Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ." 42 U.S.C. § 423(d)(1)(A). A disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1)  An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)  An individual will be found not disabled if he or she does not have a "severe impairment," or a combination of impairments that is severe, and of the requisite duration.

>   (3)  An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1], and meets the duration requirement, will be considered disabled without the consideration of vocational factors.
>
>   Before proceeding to step four, the Commissioner assesses the individual's residual functional capacity, which is used at both step four and step five to evaluate the claim.
>
>   (4)  If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.
>
>   (5)  If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy. If the individual can make such an adjustment, then he or she will be found not disabled. If the individual is unable to adjust to other work, then he or she will be found disabled.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.

When a finding of "disabled" or "not disabled" may be made at any step, a decision will be rendered at that point without proceeding to the remaining steps. 20 C.F.R. §§ 404.1520, 416.920; *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). "The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step." *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (citation omitted).

## The ALJ's Findings

**I.  Steps One, Two, and Three**

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period. (Tr. 17). At step two, she found that the claimant suffered severe impairments of coronary artery disease ("CAD"); wedging vertebra at T12 and L1; and bulging disc, annular tear at L5-S1, acquired stenosis, and

4

lumbar radiculopathy. (Tr. 18).[1] She concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process. *Id*.

## II. Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform the full range of light work.[2] (Tr. 18-20).

## III. Steps Four and Five

The ALJ concluded at step four of the sequential evaluation process that the claimant was unable to return to past relevant work. (Tr. 20-21). Accordingly, she proceeded to step five. At this step, the ALJ determined that the claimant was an individual closely approaching advanced age, with a limited education. *Id*. Transferability of skills was not material to the determination of disability. *Id*. The ALJ then concluded that given the claimant's vocational factors, and an RFC for the full range of light work, the Medical-Vocational Guidelines directed

---

[1] The ALJ further determined that the claimant's hypertension, left wrist laceration, mild acromioclavicular joint osteoarthritis on the right, and trigger finger on the right either did not satisfy the durational requirement or did not cause more than minimal limitation in the claimant's vocational functioning, and, thus, were not severe. *Id*.

[2] Light work entails:
> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

a finding of not disabled.   20 C.F.R. § 404.1569; Rule 202.11, Table 2, Appendix 2, Subpart P, Regulations No. 4.   *Id*.

### Non-Exhaustive Chronology of Relevant Medical Evidence

On November 27, 2018, Johnson went to the emergency room for a cut on his left wrist. (Tr. 412-424).   He was scraping floors when the scraper slipped and dug into his wrist.   *Id.* He received two stitches and was released.   *Id.*

On March 6, 2019, Johnson went to a primary care clinic for severe index and ring finger pain to his right hand for the past two weeks.   (Tr. 368-370).   He was unable to bend his finger.   *Id.*   At that time, he reported no muscle aches, no arthralgias/joint pain, no back pain, no joint swelling, and no neck pain.   *Id.*   However, the pointer and ring fingers of his right hand would lock up and require passive manipulation of the finger to achieve normal motion. *Id.*   He ambulated normally, with normal movement of all extremities and no tenderness.   *Id.* He was diagnosed with right hand pain and trigger finger of the right hand.   *Id.*

Johnson went to the emergency room on April 2, 2019, for complaints of chest pain. (Tr. 427-479).   He stated that he had gone to his son's house to work.   *Id.*   He admitted to smoking half a pack of cigarettes per day.   *Id.*   His pain was a six on a ten-point scale.   *Id.* An April 1, 2019, chest x-ray was normal.   *Id.*   Johnson refused to stop smoking.   (Tr. 461). He frequently went outside to smoke while at the emergency room.   (Tr. 464).   He left ambulatory to his vehicle.   (Tr. 467).   No distress was noted.   *Id.*

On April 4, 2019, Johnson was transferred to St. Francis Medical Center for complaints of mild chest pain that was radiating to his left arm.   (Tr. 317-322).   He had no back pain.   *Id.* He exhibited a normal range of motion, with no edema or tenderness. *Id.*   Dr. Thomas Smith,

M.D., noted that Johnson had been having chest pains. (Tr. 322-324). A repeat EKG was stable and inconsistent with ST elevation. *Id.* Smith recommended a heart catheterization. *Id.*[3] Michelle Blake, M.D., noted that prior to this past Sunday, Johnson had never had any chest pain. (Tr. 325-327). He smoked about a half pack of cigarettes per day. *Id.* An April 5, 2019, echocardiogram showed normal wall thickness, normal wall motion, low normal 50-55% ejection fraction, and indeterminate diastolic function. (Tr. 307-308).

Johnson stayed at St. Francis from April 4-6, 2019. (Tr. 327-330, 597-611). Upon discharge, he was instructed, *inter alia*, to stop smoking, monitor his heart rate and blood pressure at least twice daily, take daily aspirin, and use nitroglycerin sublingual, as needed, for chest pain. *Id.* He was to slowly increase his activity over the next two to three days back to his previous level. *Id.* While at St. Francis, Johnson was instructed multiple times to cease smoking. *Id.* Nonetheless, he left the floor multiple times to go smoke. *Id.* He was referred to the outpatient smoking cessation program. *Id.*

Johnson returned to the primary care clinic on April 16, 2019, with complaints of left side, lower back pain for the past two to three days. (Tr. 373-374). It hurt while sitting and walking and was worse when he was standing. *Id.* His trigger finger had improved temporarily, but now was no better. *Id.* He had occasional shooting pain to his right buttocks, but ambulated normally. *Id.* He had normal movement of all extremities and a normal gait and station. *Id.* However, he had positive straight leg raise on the right. *Id.*

---

[3] Johnson underwent a left heart catheterization on April 5, 2019, which revealed minimal stenosis. (Tr. 311-312). The physician recommended treatment of nonobstructive coronary artery disease with aspirin and statins. *Id.* However, Johnson would need to modify his blood pressure, glucose control, lipid control, tobacco abstinence, and exercise. *Id.*

On May 1, 2019, Johnson went to the emergency room for complaints of a *snake* bite to his right forearm. (Tr. 559-568). He had been under a house working before noticing it. *Id.* After evaluation, it was determined that it was unlikely that he suffered a *spider* bite. *Id.* He was discharged to home and ambulated without difficulty. *Id.*

Johnson returned to the emergency room on May 6, 2019, with complaints of chest pain. (Tr. 389-409). Since his last emergency room visit, he had experienced intermittent chest pain that responded to nitroglycerin. *Id.* He worked as a carpenter. *Id.* He had moderate pain in his left chest that radiated to his left arm. *Id.* At that time, however, the pain was minimal. *Id.* Exacerbating factors included exertion, movement, breathing, and coughing. *Id.* He had a normal range of motion, normal strength, and no tenderness. *Id.* Differential diagnosis was unstable angina, angina, anxiety, pulmonary embolism, atypical chest pain, aortic dissection, pneumonia, and GERD. *Id.* He was kept overnight and discharged the next day. *Id.*

Johnson returned to the emergency room on May 18, 2019, because he had been struck by a board while pulling off another board in his shop. (Tr. 480-491). The nail cut his hand. *Id.* He received eleven stitches to his right thumb. *Id.*

Johnson returned to the emergency room one-week later on May 26, 2019, with sudden onset of chest pain that was a 4/10. (Tr. 492-549). He lived alone. *Id.* He was discharged via wheelchair, but ambulatory. *Id.* He reported having a heart attack one month earlier. *Id.* He was admitted overnight. *Id.* A chest x-ray was normal. *Id.* His discharge diagnoses included, *inter alia*, atypical chest pain, coronary artery disease, overweight, continuous tobacco dependence. *Id.* He smoked one and one-half packs per day and was counseled on smoking cessation. (Tr. 498).

Johnson tested positive for marijuana use on May 26, 2019. (Tr. 778).

On June 12, 2019, Johnson went to the emergency room with complaints of back pain. (Tr. 552-557, 569-586). He had posterior right flank pain for the past three days that worsened with coughing and movement. *Id.* Position change exacerbated the pain. *Id.* He was a current every-day smoker. *Id.* His extremities exhibited a full range of motion, with no muscle wasting. *Id.* Straight leg raise was negative. *Id.* He ambulated without difficulty and moved all extremities without difficulty. *Id.* His gait was normal, with 5/5 motor strength. *Id.* He was diagnosed with myofascial pain and given a Z-pack. *Id.* He drove himself. (Tr. 579). He did not drink alcohol. *Id.*

On June 28, 2019, Johnson went to the emergency room in a wheelchair with complaints of moderate left hip pain for the past two days. (Tr. 588-590, 639-660). The pain occurred after he stood up from his knees while hoisting a metal plate. *Id.* He also reported left leg and arm numbness. *Id.* An x-ray of the lumbar spine showed loss of disc space at L1-L2 and L3-L4, plus anterior endplate remodeling at T12-L1 and L1-L2 and L3-L4. *Id.* He was diagnosed with sciatica and prescribed flexeril and naproxen. *Id.*

Johnson returned to the emergency room two days later on June 30, 2019, with complaints of severe left leg and hip pain. (Tr. 661-679). He was ambulatory with a walker and dragging his left leg. *Id.* He reported continued pain and numbness to his left hip and leg. *Id.* He described his pain as a 10/10. *Id.* However, he was ambulatory upon discharge. *Id.*

On July 2, 2019, Johnson had an initial evaluation for physical therapy for his lumbar pain issues. (Tr. 680-682). He stated that the pain started about seven days earlier when he reached over to lift an object and felt a pop in his lower back. *Id.* His pain radiated from his

left hip to his left lower extremity. *Id.* He stated that his pain was severe and rated it as a 6/10. *Id.* He went to the clinic in a wheelchair and was unable to stand due to the pain. *Id.* The physical therapist indicated that Johnson was unable to perform his work-related activities at that time. *Id.* He was unable to lift heavy objects, and he could not walk at all. *Id.* He could not sit longer than 30 minutes. *Id.* The pain restricted his social life. *Id.* Nevertheless, Johnson admitted that he cared for his disabled wife. *Id.*[4]

Johnson returned to physical therapy on July 8, 2019, and reported that he had fallen twice over the weekend. (Tr. 685). He was using a rolling walker. *Id.* His left lower extremity gave out on him. *Id.* The physical therapist gave him a back brace to wear when he was up and walking. *Id.*

Johnson went to his primary care physician on July 9, 2019, with complaints of severe left lower extremity pain. (Tr. 772). He had fallen twice the week before. *Id.* He had decreased motor strength in his knee. *Id.* The clinician diagnosed Johnson with lumbar radiculopathy and left lower extremity weakness and ordered an MRI of the lumbar spine. *Id.*

Johnson was discharged from physical therapy on July 15, 2019, for failure to attend. (Tr. 689).

Johnson next went to the emergency room on July 20, 2019, for complaints of moderate left lower extremity pain for the past four to five days. (Tr. 691-713). At that time, he was concerned that he had a blood clot. *Id.* He described his pain as dull and burning and a 7/10. *Id.* Upon examination, there was questionable tenderness to the left anterior shin. *Id.*

---

[4] This is inconsistent with another instance in the medical treatment record where Johnson represented that he lived alone. *See* Tr. 492-549.

Four days later, Johnson returned to the emergency room with complaints of chest pain. (Tr. 612-637). He admitted that he had smoked one pack of cigarettes per day for the past 20 years. *Id.* He was negative for back pain and myalgias and had a normal range of motion. *Id.* Smoking cessation was strongly recommended. *Id.* His discharge diagnoses included chest pain and tobacco abuse. *Id.* Discharge instructions included normal activity, as tolerated. *Id.*

On July 26, 2019, Johnson was seen at the heart clinic where he was ambulating in the room in no acute distress. (Tr. 804-807).

Johnson returned to the heart clinic for follow-up on August 2, 2019. (Tr. 820-824). He still refused to cease smoking. *Id.* He denied back pain, stiffness, neck pain, joint pain, or swelling. *Id.* He had a smooth gait and upright posture. *Id.*

Non-examining agency psychologist, Stephanie Crall, Ph.D., reviewed the record on August 22, 2019, and determined that Johnson had no medically determinable mental impairment. (Tr. 56).

On August 22, 2019, non-examining agency physician, Herbert Meites, M.D., reviewed the record and completed a physical residual functional capacity assessment consistent with the full-range of light work. (Tr. 57-59).

Johnson next went to the emergency room on September 3, 2019, for chest pain and an elevated heart rate. (Tr. 715-735). He was ambulatory. *Id.* He checked himself out against medical advice after being told that he could not go outside to smoke. *Id.* A chest x-ray was normal. *Id.*

Treatment notes from October 23, 2019, indicate that Johnson could not have back surgery until his heart was stable. (Tr. 770).

Non-examining agency psychologist, Lawrence Guidry, Ph.D., reviewed the record on December 11, 2019, and determined that Johnson had no medically determinable mental impairment. (Tr. 82-83).

On December 12, 2019, non-examining agency physician, James Crout, M.D., reviewed the record and issued a physical residual functional capacity assessment consistent with the full range of light work. (Tr. 84-85).

Johnson returned to the emergency room on December 21, 2019, with complaints of vomiting blood, black stools, and mild right shoulder pain. (Tr. 736-760). He was ambulatory. *Id.* He still smoked one pack of cigarettes per day. *Id.* He admitted to drinking in the past and recreational marijuana use. (Tr. 739). Johnson declined admission and signed out against medical advice. (Tr. 743). A December 21, 2019, x-ray of the right shoulder showed mild AC joint osteoarthritis. (Tr. 747).

On January 21, 2020, Johnson had pain to his right arm, hand, and right side of his neck for the past two weeks. (Tr. 768).

On February 20 and March 19, 2020, Dr. Williams diagnosed Johnson with lumbar radiculopathy, cervicalgia, and coronary artery disease. (Tr. 766-767).

On April 16, 2020, Johnson reported that his symptoms were worse on the left side. (Tr. 765). It was difficult for him to walk, and he was in a wheelchair. *Id.*

## Analysis

In her decision, the ALJ reviewed the available evidence, including the hearing

testimony, the claimant's activities of daily living, treatment records, and the impressions of the non-examining state agency medical consultants. (Tr. 18-20). In deriving Johnson's RFC, the ALJ found that the opinions of the state agency medical consultants were persuasive because they were supported and consistent with the totality of the evidence. *Id*.

In his brief, Johnson advanced one assignment of error: the ALJ's RFC is not supported by substantial evidence because she failed to exercise reasonable efforts to obtain a medical source statement from a treating or examining physician as mandated by *Kneeland v. Berryhill*, 850 F.3d 749 (5th Cir. 2017). Johnson emphasized that this omission constitutes reversible error because if the ALJ had assigned any additional limitation that reduced his RFC below the full range of light work, then, in light of his age and vocational factors, a finding of "disabled" would have been mandated under the medical-vocational guidelines.

In *Kneeland*, the court stated that, "the reports of physicians who did not examine the claimant, taken alone, would not be substantial evidence on which to base an administrative decision." *Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017) (internal quotation marks omitted) (quoting *Strickland v. Harris*, 615 F.2d 1103, 1110 (5th Cir. 1980)). The language in *Kneeland*, however, constitutes dictum because in that case there was a medical opinion from an examining source that the ALJ ignored. *Kneeland, supra*.

Furthermore, in *Strickland*, the court noted that the "reports of physicians who did not examine the claimant, taken alone, would not be substantial evidence on which to base an administrative decision." *Strickland*, 615 F.2d at 998 (internal quotation marks omitted) (quoting *Johnson v. Harris*, 612 F.2d 993, 998 (5th Cir. 1980)). In that case, however, the report of the non-examining agency physician was not supported by the findings of the examining or treating physicians. *Id*.

13

In *Johnson*, the Fifth Circuit stated,

> *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842, 853 (1971) holds that a written report by a licensed physician who has examined a claimant can constitute substantial evidence on which to support an administrative decision to deny social security benefits. If it is true that the physicians who reported on Johnson's condition did not even see him, this alone would not be substantial evidence on which to base an administrative decision. Whether these physicians did see Johnson or had other adequate acceptable information before making their reports is *another* inquiry to pursue at the further hearing.

*Johnson*, 612 F.2d at 998 (emphasis added). Again, however, the statement that reports from non-examining physicians alone do not constitute substantial evidence was dictum.

Of course, another important distinction between this case and *Kneeland* and its predecessors is that the latter cases all were decided prior to the still recent amendment to the regulations. For claims filed on or after March 27, 2017, the Commissioner no longer affords "controlling weight" to the opinions of treating physicians and will not defer or give any specific evidentiary weight to any medical opinion(s) from the claimant's medical sources. 20 C.F.R. §§ 404.1520c(a) and 416.920c(a). Furthermore, the fact that a medical source actually examined the claimant or specializes in an area germane to the claimant's medical issues are not primary or dispositive considerations in assessing the medical opinion. *See* 20 C.F.R. §§ 404.1520c(c) and 416.920c(c). Rather, when determining the persuasiveness of a medical opinion, the most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2).[5]

---

[5] Only when two or more medical opinions about the same issue are both equally well-supported and consistent with the record, but "not exactly the same," then the Commissioner will articulate how she considered the "other most persuasive factors," such as the medical source's relationship with the claimant (including the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and the examining relationship); the medical source's specialization; and other factors (including a

14

Here, the ALJ found that the assessments of the non-examining agency consultants were persuasive because they were supported by an explanation of the record and were consistent with the cardiovascular and musculoskeletal findings in the treatment records. (Tr. 19).

Furthermore, Johnson's statements regarding the effects of his impairments were not consistent. *See* 20 C.F.R. § 404.1529(c)(4) ("[w]e will consider whether there are any inconsistencies in the evidence . . ."). For example, after the alleged onset of disability, Johnson continued to engage in work-like activities such as "working" at his son's house, working under a house, and lifting heavy objects. *See* discussion, *supra*. Moreover, at times, when Johnson was being seen for his alleged musculoskeletal impairments, he presented in a wheelchair or with a walker, but then when he went to the emergency room or appointments for his heart condition, he was ambulatory. *See* discussion, *supra*.

Johnson also exhibited continued resistance towards repeated admonitions by his medical team to cease smoking. *See* 20 C.F.R. § 404.1530(b) (failure to follow prescribed treatment without a good reason will result in a finding of not disabled). He also frequently underreported his daily cigarette habit. Finally, Johnson was less than consistent about his marijuana use,[6] and whether he drove.[7] Such inconsistencies serve to undermine the efficacy of Johnson's self-professed limitations and further buttress the ALJ's reliance on the opinions of the non-

---

medical source's familiarity with other evidence of the claim or an understanding of the agency's disability program's policies and evidentiary requirements). 20 C.F.R. §§ 404.1520c(b)(3)-(c) and 416.920c(b)(3)-(c).

[6] For example, he denied alcohol and illicit drug use on June 24, 2019. (Tr. 522). However, he later admitted to drinking in the past and recreational marijuana use. (Tr. 739).

[7] At the July 8, 2020, hearing Johnson testified that he had received a DUI two to three years ago and that he no longer drove. (Tr. 34-35). However, he drove himself to the emergency room less than one year before the hearing. (Tr. 552-557, 569-586).

examining agency medical consultants.

Johnson ultimately argues that the ALJ should have recontacted his treating physicians to obtain a medical source statement or sent him for a consultative examination. Under the current regulations, however, the Commissioner will not recontact a medical source or otherwise purchase a consultative examination if all of the medical opinions of record are consistent and there is sufficient evidence for the Commissioner to render a decision. *See* 20 C.F.R. §§ 404.1520b(a) and 404.1519a. Indeed, the ALJ need not order a consultative examination at government expense "unless the record establishes that such an examination is necessary to enable the administrative law judge to make the disability decision. *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989) (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)). Here, the record sufficed for the ALJ to render a decision. In fact, at the hearing, Johnson, via counsel, acknowledged that he had viewed the record, had no objection to same, and that, to his knowledge, it was complete. (Tr. 33).

Finally, to obtain reversal due to the ALJ's failure to adequately develop the record, the claimant also must demonstrate resulting prejudice. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996). "To establish prejudice, a claimant must show that he could and would have adduced evidence that might have altered the result." *Id.* (Internal quotes omitted). Johnson has not made the requisite showing here.

## Conclusion

The ALJ in this case was tasked with determining whether the claimant was disabled. In so doing, she considered the hearing testimony, the medical records, and expert opinion evidence. The evidence was not necessarily uniform, and according to Johnson, should have compelled a different result. However, conflicts in the evidence are for the Commissioner to

resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted). **This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."** *Newton, supra* (emphasis added). Rather, the limited dual inquiry presented is whether the Commissioner's determination that plaintiff was not disabled under the Social Security Act is supported by substantial evidence and free of legal error. Upon review of the arguments, the court is satisfied that the Commissioner's decision comports with the foregoing standard. Accordingly,

IT IS RECOMMENDED that the Commissioner's decision be AFFIRMED, in its entirety, and that this civil action be DISMISSED with prejudice.

Under the provisions of 28 U.S.C.§ 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party=s objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 27th day of July, 2022.

                                                        KAYLA DYE MCCLUSKY
                                                        UNITED STATES MAGISTRATE JUDGE